IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DAVID L. DANIELS                                        PLAINTIFF

          v.              Civil No. 06-5121

CPL. REAMS; and
OFFICER HERNANDEZ                                      DEFENDANTS

O R D E R

Now on this 17th day of July, 2008, come on for consideration the **Report And Recommendation Of The Magistrate Judge** ("R&R")(document #57); plaintiff's **Motion For A Retrial** (document #62); and plaintiff's **Objections To R&R** (document #63), and the Court, being well and sufficiently advised, finds and orders as follows:

1.   In this *pro se* case brought pursuant to **42 U.S.C. §1983**, plaintiff David L. Daniels ("Daniels"), then a pre-trial detainee in the Benton County Detention Center ("BCDC"), alleges that defendants Cpl. Reams ("Reams") and Officer Hernandez ("Hernandez") used excessive force against him in an incident (the "Incident") that occurred on June 1, 2006.

2.   Daniels requested a jury trial in this matter, and the Magistrate Judge conducted a pre-trial evidentiary hearing to determine whether Daniels' claim warranted a jury trial, a procedure approved in **Johnson v. Bi-State Justice Center**, **12 F.3d 133 (8th Cir. 1993)**. When this procedure is used, the standard for decision is whether -- accepting as true all the inmate's

evidence and drawing all justifiable inferences in favor of the inmate -- the evidence presents a sufficient disagreement to require submission to a jury,  or "'whether it is so one-sided that one party must prevail as a matter of law'." *Id.* **at 136**, quoting **Anderson v. Liberty Lobby, Inc.**, **477 U.S. 242, 251-52 (1986)**.

3.    The evidence at the hearing, when evaluated in the light most favorable to Daniels under the foregoing standard, depicts the following scenario:

*    On June 1, 2006, Reams and Hernandez were walking behind Daniels in a hallway, and noticed that Daniels had his shirt untucked in back.  BCDC requires shirts to be tucked in as a security measure, since an inmate can more easily conceal items in his waistband if his shirt is not tucked in.

*    Daniels was returning from a court appearance, and had his court papers in his hand.  Hernandez recognized that Daniels must have been returning from court because of the papers in Daniels' hand.

*    Reams told Daniels -- twice -- to tuck in his shirt. Daniels replied -- both times -- that it *was* tucked in.  Reams then pushed Daniels up against a wall and Hernandez took Daniels' court papers from him.  At that point, Daniels tucked in his shirt -- which he admits was pulled out in back -- and complained that "[y]ou didn't have to put your hands on me to do all that -- all

-2-

you had to do was just take the papers."

* Hernandez then gave Daniels back his court papers and told him to "get out of here." Either Reams or Hernandez then told Daniels to put his free hand behind his back. BCDC requires inmates, when walking in the hallways, to walk with their hands behind their back (or their free hand, if they are carrying something in one hand) as a security measure, since that makes it easier to see what an inmate is doing with his hands.

* Daniels has given three accounts of what happened next. In one account (hearing testimony), he says that when he had taken four or five steps, he was hit from behind, dropped his court papers, hit a window, and fell down on his belly.  In another account (hearing testimony), he says he stopped and got ready to turn around, but Reams and Daniels did not give him a chance to say anything, they had already "rushed" him. In a Grievance prepared by Daniels on the date of the Incident, and introduced by Daniels at the evidentiary hearing, he wrote that Reams and Hernandez "said put your hands behind your back.  How can I with a discovery and motions waying [sic] me down, they knew it.  As I turned around Officer Hernandez & Cpl. Remas slam [sic] me [illegible] the wall knowing my head and papers into the wall. . . ."  In none of these accounts did Daniels say that he obeyed the instruction to put his free hand behind him.

* Hernandez put his knee in Daniels' back, gave him a

-3-

"kidney shot" (which Daniels explained as a "punch") and kneed him "in the crotch area."

* Reams and Hernandez handcuffed Daniels and dragged him to his cell, where they made him sit on his knees while going through his mail.

* Daniels relates the following physical conditions to these contacts: chipped tooth, bleeding lip, back pain, knee pain and swelling, and bleeding from his penis.

* Daniels did not mention the chipped tooth or bleeding lip in the Grievance he filed about the Incident.  In a Medical Request dated December 6, 2006, he stated that "its been 9 months my fillings fell out my teeth and a year for chip tooth."

* Daniels was receiving Social Security Income benefits because of back problems before the Incident.

* The medical records subpoenaed at Daniels' request indicate that Daniels had seen the BCDC doctor on May 30, 2006, for bleeding from his penis.

4.   The Magistrate Judge concluded, on the basis of the evidence at the evidentiary hearing, that force was used only after Daniels failed to comply with a verbal command to put his free hand behind his back, and that his injuries were insufficient to sustain a claim that his Fourteenth Amendment rights were violated in the Incident.

5.   Daniels attacks the R&R in two ways.  First, he moves

-4-

for a "retrial," for three reasons:

     \* that he had insufficient time to review his medical records before the evidentiary hearing;

     \* that he did not have testimony from the "witnesses of his choice"; and

     \* that he was prejudiced because "the officers & defendants" were allowed to remain in the courtroom during all the testimony.

     Second, he makes the following Objections to the R&R:

     \* that he was prejudiced as noted above by the presence of the BCDC witnesses during all testimony;

     \* that he did not receive a "disciplinary" with regard to the Incident;

     \* that the fact he lost his "slippers" and court papers is evidence in his favor;

     \* that "Benton County has numerous excessive force & liability civil cases going on in the Western District Courts of Arkansas";

     \* that Adam Leadford testified favorably to him, both as to the use of force by defendants on Daniels and the as to the use of force by Hernandez against Leadford;

     \* that William Brown testified to seeing Hernandez use force against an unnamed inmate;

     \* that Brown, Nathan Thompson, Jeremiah Davis, and Chris

Drosopolous testified to the use of force and to the fact that Daniels looked like he needed medical attention, and that they had seen Daniels "abused in this manner" before;

* that his witness list was cut, and that neither Chris Blount nor any of "the officers the court picked out" had seen the Incident, and that Christie Ross, Robert Mix, Todd Hall, Officer Colman, Ian Gilbert, Ronny Reynolds, David Mitchell "& a few others on his subpoena list" would have "turn[ed] the trial in plaintiff's favor";

* that he did not have the assistance of an attorney to prove his case in spite of so requesting;

* that one of his "key witnesses," who had "all the important paperwork that was needed to turn this case around," was not subpoenaed; and

* that he did not have time to go through his medical records.

6.   Grouping the foregoing points in the order that seems logical, the Court comes to the following conclusions:

(a)  The fact that Daniels had little time to review his medical records is not a basis either for retrial or for rejection of the R&R.  Daniels' medical records and medical request sheets from BCDC were subpoenaed, and it is clear from the R&R that the Magistrate Judge gave these records the careful review they deserved.  This Court has also reviewed the medical records.

-6-

The Magistrate Judge did not find support in the medical records for any inference that Daniels was seriously injured in the Incident.  To the contrary, he found that Daniels had a long history of medical treatment for his back, both before and after the Incident, and that no medical records showed that the Incident aggravated his back condition or contributed to his need for medical treatment.  He found no record of Daniels having submitted any request for medical treatment for injuries sustained in the Incident. He found that requests for treatment for the knee were related by Daniels himself to a fall.  He also found that Daniels had been treated for bleeding from his penis on May 30, 2006, two days before the Incident.  The Court's review of the medical records confirms the findings of the Magistrate Judge.

While the Court is required, at this stage of the proceedings, to accept as true Daniels' testimony as to the facts of the Incident, i.e., that Hernandez put his knee in Daniels' back, gave him a "kidney shot," and kneed him "in the crotch area," the Court is not required to accept Daniels' *conclusions* that these contacts caused any particular medical problem.  The evidence is strongly to the contrary.  Daniels' medical records -- evidence he presented and which the Court must accept as true at this stage of the case -- do not support Daniels' contention that he sustained more than minimal injury in the Incident, and the Court finds no reason to conduct another evidentiary hearing, or

-7-

to reject the R&R, because Daniels himself did not have time to comb through them.

(b)   The fact that Daniels did not have the testimony of all the witnesses he listed does not require a retrial or rejection of the R&R.  Daniels requested that the Magistrate Judge subpoena 57 witnesses, and it was clear, from his indication of the testimony he expected them to give, that many had no first-hand knowledge of the Incident.[1]  It was not error to refuse to subpoena those people.

In the category of people who might have had some first-hand knowledge of the Incident, Daniels listed 24 witnesses employed at BCDC, each of whom was said to have five or ten minutes of testimony regarding abuse, harassment, excessive force, prejudice, or some combination of these.  The same is true of the 18 inmate witnesses listed by Daniels. The evidence of these witnesses would clearly have been cumulative to the point of redundancy, and the Magistrate Judge was justified in selecting six in each category to subpoena.  Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of "needless presentation of cumulative evidence." **F.R.E. 403.** The fact that some of the witnesses who were subpoenaed were not present at the time of the Incident is not the fault of the

---

[1]For example, he asked the Court to subpoena Carlton Bailey, a professor at the University of Arkansas School of Law; Judge David Clinger, an Arkansas Circuit Judge; Brenda DeShields, an Arkansas Clerk of Court; and Brad Karren, a Benton County lawyer.

Magistrate Judge, but of Daniels, who identified them as witnesses.

The Court is likewise not persuaded that the R&R should be rejected based on Daniels' contention that witnesses who "would have "turn[ed] the trial in plaintiff's favor," and who had "all the important paperwork that ws need to turn this case around," were not subpoenaed. With the exception of Officer Colman, Daniels gives the Court no indication about how the testimony of these witnesses would have helped him, nor what paperwork was so important. Officer Colman is said to have seen the Incident, but that was also said of two other non-defendant BCDC employees who testified, Officer Carlton and Sgt. Tomlin. The lack of Officer Colman's testimony, under these circumstances, does not justify retrial or rejection of the R&R.

(c) Daniels contends that he was prejudiced because the Magistrate Judge allowed the BCDC witnesses to remain in the courtroom during all of the testimony. While the Court believes that the better practice is to sequester witnesses, a witness is not necessarily disqualified by hearing the testimony of other witnesses. Even when there has been a violation of a sequestration order, "it is well established that the witness is not necessarily disqualified and that the witness may instead be proceeded against for contempt." **U.S. v. Smith**, **578 F.2d 1227, 1235 (8th Cir. 1978).**

-9-

Here, the testimony of Reams and Hernandez differed sufficiently that it is clear one was not merely parroting the testimony of the other.  The other BCDC employees did not recall the Incident, so they were clearly not parroting a version of the Incident they heard in the courtroom.  Under these circumstances, the Court is not persuaded that the R&R should be rejected, or that Daniels should have a jury trial, because of the presence of the BCDC witnesses in the courtroom during the evidentiary hearing.

(d)  Some evidence that Daniels claims to support his case either is not admissible, or is so equivocal as to be non-probative.  The fact that neither Reams nor Hernandez wrote up a "disciplinary" about the Incident is not probative, as this might have been due to oversight.  The testimony about other examples of use of force by the defendants cannot be used to prove that defendants used excessive force against Daniels during the Incident, **F.R.E. 404,** and Daniels' own assertion that Benton County has other excessive force cases pending is similarly non-probative.

(e)  Daniels points out various aspects of the testimony that favor his case, and suggests that this evidence justifies rejecting the R&R.  The evidence in question includes the fact that he lost his "slippers" and court papers during the Incident, and that the inmate witnesses who testified described injuries to

-10-

him and said he appeared to be in pain.  While this evidence does
tend to favor Daniels' case, it does not provide the turning point
hoped for by Daniels.  This evidence indicates that force was used
during the Incident, but it is undisputed that force was used.
The issue is whether *excessive* force was used.

Excessive force claims are analyzed differently, depending on
the status of the claimant.

> If the victim is an arrestee, the Fourth Amendment's
> "objective reasonableness" standard controls.  The
> evaluation of excessive-force claims brought by pre-
> trial detainees, although grounded in the Fifth and
> Fourteenth Amendments rather than the Fourth Amendment,
> also relies on an objective reasonableness standard.
> While we have not drawn a bright line dividing the end
> of the arrestee's status and the beginning of the pre-
> trial detainee's status, it is clear that the state may
> not punish a pretrial detainee.  Excessive-force claims
> brought by prisoners fall under the protections provided
> by the Eighth Amendment's prohibition of cruel and
> unusual punishment.  We consider "whether force was
> applied in a good-faith effort to maintain or restore
> discipline or maliciously and sadistically for the very
> purpose of causing harm.

**Andrews v. Neer**, **253 F.3d 1052, 1060-61 (8th Cir. 2001)**(internal
citations omitted).

In Daniels' case, it is not clear when he went from pre-trial
detainee status to convicted prisoner status, and the Magistrate
Judge chose to analyze his excessive force claim entirely under
the more favorable (to Daniels) standards applicable to a pre-
trial detainee.  This Court will do the same.

The "objective reasonableness" standard calls for "a careful
balancing of the nature and quality of the intrusion" on the

-11-

constitutionally-protected right against "the countervailing governmental interests at stake." **Graham v. Connor**, **490 U.S. 386, 396 (1989)**. In the case at bar, those governmental interests relate to the operation of a detention facility, which, as the Supreme Court recognized in **Bell**, is "a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." **441 U.S. at 559**. While the state is not allowed to punish a pre-trial detainee for the crime of which he stands accused, it is allowed to enforce its legitimate governmental interests in institutional security, order, and efficiency in the institution's operation. **Andrews**, **253 F.3d at 1061**. These are the interests that must be balanced against Daniels' Fifth and Fourteenth Amendment rights to due process of law.

In **Andrews**, the Eighth Circuit approved the use of a jury instruction in a pretrial detainee's excessive force case that told the jury they could consider

> such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether it was used for punishment or instead to achieve a legitimate purpose such as maintaining order or security . . . and whether a reasonable officer on the scene would have used such force under similar circumstances.

**253 F.3d at fn7**. The "reasonableness" of a particular use of force is judged from the perspective of a reasonable officer on

the scene in light of the circumstances, not by examining the actual intent or motivation of the officers involved. **Graham**, **490 U.S. at 397.** As has often been repeated in the case law, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers'," is excessive or violates constitutional rights. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.*

Unrefuted evidence was presented at the evidentiary hearing to the effect that BCDC's rules requiring inmates to tuck in their shirts and walk with their hands behind their backs were rationally related to security, in preventing inmates from hiding contraband and allowing guards to see what inmates are doing with their hands when walking in hallways. Even taking the testimony of Daniels at its most favorable, he refused to obey the first of these rules after being told to do so twice, only following the rule when defendants laid hands on him.

With regard to the second rule, Daniels' testimony does not reflect that he complied when asked to put his free hand behind his back, and in one version of his testimony -- and in his Grievance -- he indicates that he stopped when told to put his hand behind his back, and was turning to "talk" to Reams and

Hernandez about the command, rather than comply with it.

This defiance of commands to obey institutional security rules occurred when Daniels was returning from a trip outside the detention center, where he could have acquired contraband such as a weapon. Viewed objectively, Reams and Hernandez were justified in using some degree of force to require Daniels to comply with their commands that he follow the rules.

Daniels suggests that an inference of excessive force may be drawn from the fact that he lost his "slippers" and court papers during the Incident, and that the inmate witnesses who testified described injuries to him and said he appeared to be in pain. The Court does not agree that this evidence will bear the weight Daniels assigns to it. Excessive force would not be required to cause a person to drop a handful of papers (Daniels repeatedly stressed that it was a very large handful of papers) or to lose slippers (as opposed to fitted shoes), and a grimace might well be occasioned by very little force, or even feigned.

By contrast, the only fair inference that can be drawn from the medical records subpoenaed at Daniels' request is that the force used was *not* excessive. Daniels contends he suffered a chipped tooth, bleeding lip, back pain, knee pain and swelling, and bleeding from his penis as a result of the Incident. He did not mention the chipped tooth or bleeding lip in the Grievance he filed about the Incident, and a Medical Request he completed on

December 6, 2006, stated that "its been 9 months my fillings fell out my teeth and a year for chip tooth."  Thus it appears the chipped tooth predated the Incident by some six months.  Daniels was receiving Social Security Income benefits because of back problems before the Incident, and had seen the BCDC doctor before the Incident, on May 30, 2006, for bleeding from his penis.  No specific injury related to the Incident was ever diagnosed.  It cannot be inferred from the foregoing that any injury was more than *de minimus*, at worst the "temporary and slight aggravation of pre-existing conditions," and thus not sufficient to support an excessive force claim.  See, e.g., **Andrews v. Fuoss**, **417 F.3d 813 (8th Cir. 2005)**, and cases cited therein.

Because there is justification for the use of force even under Daniels' own account of the Incident, and because the medical evidence does not support an inference of more than *de minimus* injury, this objection is not well taken, and will be denied.

(f)  Finally, Daniels suggests that the R&R should be rejected because he was not represented by an attorney during these proceedings.  There is, however, no constitutional right to counsel in civil suits, **Sanders v. Holloway**, **95 Fed.Appx. 842 (8th Cir. 2004)**, and this objection is without merit.

7.  For the reasons set forth above, the Court finds that the R&R is sound in all respects, and should be adopted *in toto*.

The Court further finds that plaintiff's Objections are without merit, and should be overruled.

The Court further finds that plaintiff's Motion For Retrial is without merit, and should be denied.

**IT IS THEREFORE ORDERED** that the **Report And Recommendation Of The Magistrate Judge** (document #57) is **adopted *in toto*.**

**IT IS FURTHER ORDERED** that plaintiff's **Motion For A Retrial** (document #62) is **denied.**

**IT IS FURTHER ORDERED** that plaintiff's **Objections To R&R** (document #63) are **overruled.**

**IT IS FURTHER ORDERED** that, for the reasons stated in the **Report And Recommendation Of The Magistrate Judge,** plaintiff's Complaint is **dismissed with prejudice.**

**IT IS SO ORDERED.**

            /s/ Jimm Larry Hendren
            **JIMM LARRY HENDREN**
            **UNITED STATES DISTRICT JUDGE**